No. 25-12441

# United States Court of Appeals for the Eleventh Circuit

────────────────────

ATTORNEY GENERAL, STATE OF FLORIDA,

*Defendant-Appellant,*

*v.*

FLORIDA IMMIGRANT COALITION, et al.,

*Plaintiffs-Respondents.*

────────────────────

On Appeal from the United States District Court
for the Southern District of Florida
No. 1:25-cv-21524, Hon. Kathleen M. Williams

────────────────────

## APPELLANT'S OPENING BRIEF

────────────────────

Jesse Panuccio
Evan Ezray
Jason Hilborn
Daniel Morales
**BOIES SCHILLER FLEXNER LLP**
401 East Las Olas Blvd., Suite 1200
Fort Lauderdale, FL  33301
(954) 356-0011
jpanuccio@bsfllp.com

*Counsel for Appellant Attorney
General, State of Florida*

*Attorney General, State of Florida v. Florida Immigrant Coalition, et al.*

Case No. No. 25-12441

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Defendant-Appellant Attorney General, State of Florida certifies that, to the best of his knowledge, the following is a complete list of interested persons as required by the Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 to 26.1-3:

1.    Amdur, Spencer

2.    Bakkendahl, Thomas

3.    Bartlett, Bruce

4.    Basford, Larry

5.    Brodsky, Ed

6.    Campbell, Jack

7.    Chavez, Paul R.

8.    Choi, Grace

9.    Costello, David M.

10.   Cox, Alexcia

11.   Cox, Nicholas B.

12.   DeSousa, Jeffrey P.

13.   Durrett, John

*Attorney General, State of Florida v. Florida*
*Immigrant Coalition Case No. 25-12441*

14.  Ezray, Evan M.

15.  Farmworker Association of Florida, Inc.

16.  Florida Immigrant Coalition

17.  Fox, Amira D.

18.  Gladson, William

19.  Godshall, Amy N.

20.  Goodman, Hon. Jonathan

21.  Greer, Alana J.

22.  Haas, Brian

23.  Haskell, Miriam F.

24.  Hilborn, Jason H.

25.  Jadwat, Omar

26.  Kacou, Amien

27.  Kramer, Brian S.

28.  Lamia, Christine

29.  Larizza, R.J.

30.  LaRocca, Christina I.

31.  Lopez, Susan S.

32.  Madden, Ginger Bowden

*Attorney General, State of Florida v. Florida*
*Immigrant Coalition Case No. 25-12441*

33.  Mann, William C.

34.  Morales, Daniel J.

35.  Nelson, Melissa

36.  Panuccio, Jesse

37.  Pratt, Christine K.

38.  Pryor, Harold F.

39.  Roman, Oscar S.

40.  Rundle, Katherine Fernandez

41.  Scheiner, William

42.  Schenck, Robert S.

43.  Stafford III, William H.

44.  Steinburg, Hannah

45.  Tilley, Daniel B.

46.  Uthmeier, James

47.  V.V.

48.  Wiese, Evelyn

49.  Williams, Hon. Kathleen M.

50.  Wofsy, Cody

*Attorney General, State of Florida v. Florida*
*Immigrant Coalition Case No. 25-12441*

51.    Worrell, Monique H.

52.    Y.M.

No publicly traded company or corporation has an interest in the outcome of this case or appeal.

## ORAL ARGUMENT STATEMENT

Appellant respectfully requests oral argument, which will help the Court decide the important legal issues raised by this case. In particular, this case presents significant questions about the separation of powers, federalism, and the application of a district court's contempt powers to a high-ranking State official's out-of-court speech.

# TABLE OF CONTENTS

**Page**

Table of Authorities ................................................................. iii

Statement of Jurisdiction ............................................................ 1

Statement of the Issues .............................................................. 2

Introduction ........................................................................ 3

Statement of the Case ............................................................... 7

    I.     Florida's Governmental Structure ....................................... 7

    II.    Factual and Procedural Background ................................... 10

Standard of Review ................................................................ 20

Summary of the Argument ......................................................... 21

Argument .......................................................................... 24

    I.     The District Court Applied the Wrong Legal Standard ....... 26

    II.    The April 23 Letter Did Not Violate the April 18 Order by
           "Negating the Notice" Previously Provided .......................... 32

    III.   The District Court Found Contempt of a Requirement
           Not Clearly Identified in the April 18 Order ....................... 46

    IV.   Holding Another Branch of Government In Contempt for
           Official Speech Raises Serious Constitutional Concerns
           and Should Be Reserved For Only the Clearest Violations . 51

Conclusion ......................................................................... 56

Certificate of Compliance .......................................................... 56

Certificate of Service .............................................................. 56

ii

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Abusaid v. Hillsborough Cnty. Bd. of Cnty. Comm'rs*,
  405 F.3d 1298 (11th Cir. 2005) ............................................................. 9

*ADT LLC v. NorthStar Alarm Servs., LLC*,
  853 F.3d 1348 (11th Cir. 2017) ...................................................... 50, 51

*Am. Foundry & Mfg. Co. v. Josam Mfg. Co.*,
  79 F.2d 116 (8th Cir. 1935) ................................................................. 30

*Amacio v. Gaudiuso*,
  No. 03-cv-1208, 2005 WL 1593647 (E.D.N.Y. July 7, 2005) ............... 48

*Bantam Books, Inc. v. Sullivan*,
  372 U.S. 58 (1963) ............................................................................... 53

*Barts v. Joyner*,
  865 F.2d 1187 (11th Cir. 1989) ........................................................... 50

*Blackburn v. Brorein*,
  70 So. 2d 293 (Fla. 1954) ..................................................................... 9

*Bloom v. Illinois*,
  391 U.S. 194 (1968) ............................................................................... 6

*Bruce v. Citigroup Inc.*,
  75 F.4th 297 (2d Cir. 2023) ................................................................. 31

*Cal. Artificial Stone Paving Co. v. Molitor*,
  113 U.S. 609 (1885) ........................................................ 2, 5, 26, 28, 29

*City of S. Miami v. Governor of Fla.*,
  65 F.4th 631 (11th Cir. 2023) ............................................................... 8

*Dobbs v. Jackson Women's Health Organization*,
  597 U.S. 215 (2022) ............................................................................. 40

iii

*Duke v. Texas,*
   477 F.2d 244 (5th Cir. 1973) ................................................................ 55

*Ford v. Kammerer,*
   450 F.2d 279 (3d Cir. 1971) ................................................................ 47

*Fox v. Capital Co.,*
   96 F.2d 684 (3d Cir. 1938) ................................................................ 30

*FTC v. Leshin,*
   618 F.3d 1221 (11th Cir. 2010) ........................................................... 21

*FTC v. Leshin,*
   719 F.3d 1227 (11th Cir. 2013) ........................................................... 47

*Ga. Power Co. v. NLRB,*
   484 F.3d 1288 (11th Cir. 2007) ...................................................... 21, 47

*Harris v. Samuels,*
   440 F.2d 748 (5th Cir. 1971) ............................................................. 55

*Howard Johnson Co., Inc. v. Khimani,*
   892 F.2d 1512 (11th Cir. 1990) ............................................................ 1

*Hufford v. Rodgers,*
   912 F.2d 1338 (11th Cir. 1990) ............................................................ 9

*In re Attorney Gen. of U.S.,*
   596 F.2d 58 (2d Cir. 1979) ........................................................... 23, 52

*In re Grant-Carmack,*
   No. 23-11817, 2024 WL 1433714 (11th Cir. Apr. 3, 2024) ........... 27, 30

*In re Loder,*
   796 F. App'x 698 (11th Cir. 2020) ................................................ 27, 30, 31

*In re Managed Care,*
   756 F.3d 1222 (11th Cir. 2014) ........................................................... 20

*In re Roth,*
   935 F.3d 1270 (11th Cir. 2019) ................................................ 26, 27, 30, 47

*In re U.S.*,
   985 F.2d 510 (11th Cir. 1993)................................................................52

*In re Walters*,
   868 F.2d 665 (4th Cir. 1989)................................................................50

*Int'l Longshoremen's Ass'n, Local 1291 v. Phila. Marine Trade Ass'n*,
   389 U.S. 64 (1967)................................................................28

*Int'l Union, United Mine Workers of Am. v. Bagwell*,
   512 U.S. 821 (1994)................................................................6, 25

*J.G.G. v. Trump*,
   147 F.4th 1044 (D.C. Cir. 2025) ................................................24, 53, 56

*Jove Eng'g, Inc. v. IRS*,
   92 F.3d 1539 (11th Cir. 1996)................................................................34

*Latino Officers Ass'n City of N.Y., Inc. v. City of New York*,
   558 F.3d 159 (2d Cir. 2009) ................................................................29, 30

*Mañez v. Bridgestone Firestone N. Am. Tire, LLC*,
   533 F.3d 578 (7th Cir. 2008)................................................................47

*Maye v. Klee*,
   915 F.3d 1076 (6th Cir. 2019)................................................................50

*McGregor v. Chierico*,
   206 F.3d 1378 (11th Cir. 2000)................................................................21

*Mitsubishi Int'l Corp. v. Cardinal Textile Sales, Inc.*,
   14 F.3d 1507 (11th Cir. 1994)................................................................1

*Nejad v. Attorney Gen., Ga.*,
   830 F.3d 1280 (11th Cir. 2016)................................................................42, 43

*Peery v. City of Miami*,
   977 F.3d 1061 (11th Cir. 2020)................................................................31

*Pennekamp v. Florida*,
   328 U.S. 331 (1946)................................................................53

*PlayNation Play Sys., Inc. v. Velex Corp.,*
  939 F.3d 1205 (11th Cir. 2019) ............................................................... 1

*Project B.A.S.I.C. v. Kemp,*
  947 F.2d 11 (1st Cir. 1991) ................................................................... 47

*Ratzlaf v. United States,*
  510 U.S. 135 (1994) ............................................................................... 49

*Rizzo v. Goode,*
  423 U.S. 362 (1976) ............................................................................... 54

*SEC v. Goble,*
  682 F.3d 934 (11th Cir. 2012) ................................................... 6, 23, 48

*Sellers v. Rushmore Loan Mgmt. Servs., LLC,*
  941 F.3d 1031 (11th Cir. 2019) ........................................................... 30

*Sierra Club v. Van Antwerp,*
  526 F.3d 1353 (11th Cir. 2008) ............................................................. 1

*Speech First, Inc. v. Sands,*
  144 S. Ct. 675 (2024) ............................................................................ 53

*Static Media LLC v. Leader Accessories LLC,*
  38 F.4th 1042 (Fed. Cir. 2022) ............................................................. 31

*Support Working Animals, Inc. v. Governor of Fla.,*
  8 F.4th 1198 (11th Cir. 2021) ............................................................... 10

*Szell v. Lamar,*
  414 So. 2d 276 (Fla. 5th DCA 1982) ...................................................... 8

*Taggart v. Lorenzen,*
  587 U.S. 554 (2019) ...................... 2, 5, 21, 22, 24, 26, 27, 28, 29, 31, 34

*TiVo Inc. v. EchoStar Corp.,*
  646 F.3d 869 (Fed. Cir. 2011) .............................................................. 29

*Trade Well Int'l v. United Cent. Bank,*
  778 F.3d 620 (7th Cir. 2015) ................................................................ 47

*Trump v. CASA, Inc.*,
  606 U.S. 831 (2025) ........................................................................ 5, 32

*Trump v. United States*,
  603 U.S. 593 (2024) ................................................................ 4, 24, 54

*United Beverage Co. v. Ind. Alcoholic Beverage Comm'n*,
  760 F.2d 155 (7th Cir. 1985) ................................................................ 54

*United States v. Coulton*,
  594 F. App'x 563 (11th Cir. 2014) ........................................................ 21

*United States v. Goldfarb*,
  167 F.2d 735 (2d Cir. 1948) ................................................................ 50

*Victor v. Nebraska*,
  511 U.S. 1 (1994) ................................................................................ 42

*Wood v. Georgia*,
  370 U.S. 375 (1962) ............................................................................ 53

## Statutory and Constitutional Provisions

8 U.S.C. § 1325 ................................................................................ 11

8 U.S.C. § 1326 ................................................................................ 11

8 U.S.C. § 1357 ................................................................................ 46

28 U.S.C. § 1291 .............................................................................. 1

28 U.S.C. § 1292 .............................................................................. 1

28 U.S.C. § 1331 .............................................................................. 1

Fla. Const. art. IV, § 4 .................................................................. 7, 8

Fla. Const. art. V, § 17 ...................................................................... 8

Fla. Const. art. VIII, § 1 .............................................................. 8, 9

Fla. Stat. § 16.01 ........................................................................ 7, 8

Fla. Stat. § 20.201 ................................................................ 10

Fla. Stat. § 20.24 .................................................................. 10

Fla. Stat. § 27.01 .................................................................... 8

Fla. Stat. § 27.02 .................................................................... 8

Fla. Stat. § 30.15 ................................................................. 8, 9

Fla. Stat. § 30.49 .................................................................... 8

Fla. Stat. § 811.102 ..................... 11, 12, 16, 20, 22, 35, 42, 48

Fla. Stat. § 811.103 ..................... 11, 12, 16, 20, 22, 35, 42, 48

Fla. Stat. § 908.107 .................................................................. 9

Fla. Stat. § 943.10 ................................................................... 8

## **Other Authorities**

1 WHARTON'S CRIMINAL LAW § 13:3 (16th ed.) .......................... 49

Ana Ceballos, *Florida attorney general tells cops to stop immigration arrests, obey federal judge*, MIAMI HERALD (Apr. 21, 2025) ................... 14

*ACLU Comment on Supreme Court Ruling Allowing Indiscriminate ICE Stops in Los* Angeles, ACLU (Sept. 8, 2025) .................................. 41

Antonin Scalia & Bryan A. Garner, READING LAW (2012) ..... 19, 35, 37, 38

BLACK'S LAW DICTIONARY (8th ed. 2004) ................................... 48

BLACK'S LAW DICTIONARY (12th ed. 2024) ......................... 42, 44

*Breaking: TPS Holders and Advocates Denounce Supreme Court Ruling*, ACLU (Oct. 3, 2025) .......................... 41

Bryan Garner, THE LAW OF JUDICIAL PRECEDENT 48 (2016) ................... 28

Caitlin McFall, Roe v. Wade *abortion decision: Democrats call Supreme Court 'illegitimate,'* FOX NEWS (June 24, 2022) ....................... 40

City of Miami Charter .......................................................................... 8, 10

*Eric Holder Calls on Democrats to Reform Supreme Court*,
POLITICAL WIRE (Nov. 4, 2025) .................................................. 40

F. Andrew Hessick & Michael T. Morley, *Interpreting Injunctions*,
107 VA. L. REV. 1059, 1085 (2021) ............................................ 30

Fla. Dept. of L. Enforcement, *Criminal Justice Agency Profile Report* . 12

Fla. Exec. Order No. 23-03 (Jan. 6, 2023) ........................................ 11, 55

Fla. Exec. Order No. 25-120 (June 2, 2025) ..................................... 11, 55

*Friends of the Everglades v. Noem*,
No. 25-cv-22896, Doc. 129 (S.D. Fla.) .......................................... 25

Glanville Williams, CRIMINAL LAW: THE GENERAL PART
(2d ed. 1961) ................................................................................ 42

H.W. Fowler, A DICTIONARY OF MODERN ENGLISH USAGE
(2d ed. 1965) ................................................................................ 37

*James Uthmeier orders pause to immigration arrests after judge's
ruling*, FLORIDA POLITICS (Apr. 19, 2025) .................................. 14

Khaleda Rahman, *If GOP Creates 'Illegitimate Majority' on Supreme
Court, More Justices Should be Added: Former U.S. Attorney General*,
NEWSWEEK (Sept. 20, 2020) ....................................................... 40

Lewis Carroll, THROUGH THE LOOKING-GLASS, AND WHAT ALICE
FOUND THERE (1871) ................................................................... 20

Muzaffar Chishti, Kathleen Bush-Joseph, Colleen Putzel-Kavanaugh,
and Madeleine Greene, *Biden's Mixed Immigration Legacy*:
*Border Challenges Overshadowed Modernization Advances*,
MIGRATION POLICY INSTITUTE (Dec. 10, 2024) ......................... 10

NEW OXFORD AMERICAN DICTIONARY (3d. ed. 2010) ......................... 44, 48

Ramesh Ponnuru, *Democrats Have a Decision to Make About the
Supreme Court*, WASH. POST (July 14, 2025) ............................. 40

Robert P. Warren, *Fundamentals of Good Writing* (1950) ..................... 37

*Senator Markey Statement on the Overturning of* Roe v. Wade
(June 24, 2022) ........................................................................ 40

Statement of Chief Justice Roberts (Mar. 4, 2020) ................................ 41

Br. for U.S., *Taggart v. Lorenzen*, 2019 WL 991072
(U.S. Feb. 26, 2019) ................................................................. 30

THE FEDERALIST No. 51 (Dover ed., 2014) ............................................... 7

## STATEMENT OF JURISDICTION

This is an appeal from the district court's order dated June 17, 2025 Doc. 96 ("Order"), finding the Attorney General of Florida in contempt of the district court's temporary restraining order, Docs. 28, 49. The district court had jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1331 and determined, over Defendants' objection, that Plaintiffs had standing. Doc. 28. The Attorney General timely appealed the Order on July 16, 2025. Doc. 101. This Court has jurisdiction under 28 U.S.C. § 1291 because the Order "is a final, non-conditional judgment ripe for immediate appeal." *Howard Johnson Co., Inc. v. Khimani*, 892 F.2d 1512, 1516 (11th Cir. 1990); *see PlayNation Play Sys., Inc. v. Velex Corp.*, 939 F.3d 1205, 1212 (11th Cir. 2019). This Court also has jurisdiction under 28 U.S.C. § 1292(a)(1) because the Order's "actual effect," *Mitsubishi Int'l Corp. v. Cardinal Textile Sales, Inc.*, 14 F.3d 1507, 1515–16 & n.14 (11th Cir. 1994), is to "grant[]" or "modify[]" the underlying injunctive relief. 28 U.S.C. § 1292(a)(1). *See Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1358–59 (11th Cir. 2008).

# STATEMENT OF THE ISSUES

1.  Whether the district court erred in refusing to apply the proper standard for civil contempt.  *See Taggart v. Lorenzen*, 587 U.S. 554, 561 (2019) ("civil contempt 'should not be resorted to where there is [a] *fair ground* of doubt as to the wrongfulness of the defendant's conduct'" (quoting *Cal. Artificial Stone Paving Co. v. Molitor*, 113 U.S. 609, 618 (1885))).

2.  Whether the district court erred in concluding that the Attorney General's letter criticizing its order constituted a revocation of the actual notice of the order that the Attorney General was required to provide.

3.  Whether the district court erred in holding the Attorney General in contempt for violating a requirement not clearly stated in the underlying order.

4.  Whether the separation of powers requires a court to engage in the most sensitive judicial scrutiny before holding a state attorney general in contempt for official speech on matters of public concern.

## INTRODUCTION

Comparing the sitting Attorney General of Florida to Humpty Dumpty, a district court held him in contempt for an out-of-court letter he wrote to law enforcement explaining that, even though he complied with a court order, he thought the order was not "lawful" or "legitimate." This contempt finding was erroneous because the underlying order required the Attorney General to provide actual notice of a TRO, he did so, and nothing in his subsequent letter revoked that notice. But beyond being wrong, the contempt order is dangerous. It eroded the separation of powers and, if affirmed, will chill state executive officials from publicly communicating about matters of great importance within their official purview.

The short version of events is as follows. Responding to the ill effects of the massive influx of illegal aliens in recent years, Florida enacted two statutes criminalizing illegal entry into or presence in the State. Some illegal-immigration advocacy organizations challenged the laws and sought an ex parte TRO, which the district court granted. The court applied this snap order not only to the party defendants (a limited set of state- and county-level prosecutors), but also to every law-

enforcement officer in the State.  Presumably because the court could not itself provide notice to the 40,000-plus non-parties it had enjoined, it ordered the Attorney General to "provide actual notice of the TRO" to the non-parties.  The Attorney General immediately complied, forwarding a copy of the TRO to the enjoined non-parties.

The Attorney General did so because he knows that following court orders is important.  But, as a leader of the State's executive branch and its chief legal officer, the Attorney General also has a critical role in "persuad[ing]" and communicating through the "bully pulpit," including "by speaking forcefully or critically, in ways that [he] believes would advance the public interest."  *Trump v. United States*, 603 U.S. 593, 629 (2024).  So, although the Attorney General complied with the court's order by providing notice of the TRO to non-parties, he also forcefully criticized it.  In particular, he took issue with the scope of the injunction, joining a chorus of commentary in recent years that has questioned the overbreadth of preliminary equitable relief issued by federal district courts.  Indeed, just two months after the Attorney General issued his letter, no less an authority than the Supreme Court of the United States held that federal district judges who issue overbroad injunctions and

refuse to be "bound by [the] law" are creating an "imperial Judiciary." *Trump v. CASA, Inc.*, 606 U.S. 831, 858–59 (2025).

Taking offense at the Attorney General's version of this criticism, the district court held him in contempt. The court conceded that the Attorney General's statements did *not* "encourage or induce violations of the TRO." Order at 12 n.10. Yet the court held that by saying the TRO was not "lawful" or "legitimate," the Attorney General had revoked the actual notice he previously provided. That conclusion is deeply flawed.

"[C]ivil contempt 'should not be resorted to where there is [a] *fair ground of doubt* as to the wrongfulness of the defendant's conduct.'" *Taggart v. Lorenzen*, 587 U.S. 554, 561 (2019) (quoting *Cal. Artificial Stone Paving Co. v. Molitor*, 113 U.S. 609, 618 (1885)). Here, a fair reading of the letter is that the Attorney General was not revoking any notice; he was explaining the positions he had taken in a just-filed brief and making clear (in light of media confusion) that the federal court, rather than the State's Attorney General, had ordered State law enforcement not to enforce State law. The district court reached the contrary conclusion only by eliding the actual text of the letter and then rejecting every fair ground of doubt about its favored interpretation.

5

Moreover, the district court moved the goal posts after the fact. Whereas the April 18 Order required the Attorney General only to "provide actual notice of the TRO" (i.e., to serve it), in the contempt order the district court held that the Attorney General was also required to ensure the non-parties understood the April 18 Order and its "purpose." But a "person enjoined by court order should only be required to look within the four corners of the injunction to determine what he must do or refrain from doing," and thus contempt only lies if there is a violation of "clearly and specifically describe[d] … impermissible conduct." *SEC v. Goble*, 682 F.3d 934, 952 (11th Cir. 2012). The district court therefore erred in holding the Attorney General in contempt of a requirement not found in the underlying order.

This case is an object lesson in the fact that "the contempt power … is 'liable to abuse'" because "civil contempt proceedings leave the offended judge solely responsible for identifying, prosecuting, adjudicating, and sanctioning the contumacious conduct." *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 831 (1994) (quoting *Bloom v. Illinois*, 391 U.S. 194, 202 (1968)). If a district court can hold an attorney general in contempt for the comments at issue here, the separation of

6

powers will be severely threatened. To be sure, court orders must be followed. But that fundamental premise does not immunize courts from criticism. In our Republic, all public servants—judges included—are subject to critique, even sharp critique. That is especially true if the critic is an official from a different branch of government, because the essential virtue of our system of separated powers (both horizontal and vertical) is that "each department should have a will of its own" and "ambition must be made to counteract ambition." THE FEDERALIST No. 51, at 253–54 (James Madison) (Dover ed., 2014).

There was no contempt, and this Court should reverse the district court's order.

## STATEMENT OF THE CASE

### I.    FLORIDA'S GOVERNMENTAL STRUCTURE

Under Florida's constitutional and statutory framework, the Attorney General and most other law-enforcement agencies operate as formally independent entities. At the statewide level, the Attorney General serves as Florida's "chief state legal officer," Fla. Const. art. IV, § 4(b), responsible for representing the State in "all suits or prosecutions ... in which the state may be a party," Fla. Stat. § 16.01(4). He also

appoints and supervises the Office of the Statewide Prosecutor, which prosecutes certain multi-county or statewide crimes. Fla. Const. art. IV, § 4(b). At the local level, however, independently elected state attorneys prosecute criminal violations within the State's twenty judicial circuits. *See* Fla. Const. art. V, § 17; Fla. Stat. §§ 27.01, 27.02(1). Separate from these prosecutorial offices—and deriving their authority from different legal provisions—are various state and local law-enforcement agencies, which have independent authority to "make arrests." *Id.* § 943.10(1).[1]

The Attorney General does not "control" local law enforcement. *City of S. Miami v. Governor*, 65 F.4th 631, 641–42 (11th Cir. 2023). He cannot hire, fire, or discipline local law-enforcement officers. *See, e.g.*, *Szell v. Lamar*, 414 So. 2d 276, 277 (Fla. 5th DCA 1982) ("sheriff has absolute control over the selection and retention of deputies").[2] He does not set or supervise their budgets. *E.g.*, Fla. Stat. § 30.49 (sheriffs' offices

---

[1] *Compare* Fla. Const. art. IV, § 4(b), (Attorney General and statewide prosecutor); Fla. Stat. § 16.01 (same); Fla. Const. art. V, § 17 (state attorneys); Fla. Stat. §§ 27.02–25 (same), *with id.* § 30.15 (sheriffs); City of Miami Charter subpart A, § 24 (Miami Police Department).

[2] *Compare* Fla. Const. art. VIII, § 1(d) (providing for local elections of county sheriffs), *with* Fla. Const. art. IV, § 4(b) (authorizing Attorney General to appoint statewide prosecutor); Fla. Stat. § 27.18 (authorizing state attorneys to hire subordinates).

budgets).  And he does not exercise a supervisory role over their daily activities.  *See Abusaid v. Hillsborough Cnty. Bd. of Cnty. Comm'rs*, 405 F.3d 1298, 1307 (11th Cir. 2005) (recognizing "Florida law gives sheriffs great independence in their day-to-day operations" over which "the state has retained no control").[3]

Sheriffs, for instance, are independently elected constitutional officers who serve as the "chief ... law enforcement officer[s]" of their counties.  *Blackburn v. Brorein*, 70 So. 2d 293, 296 (Fla. 1954); *see* Fla. Const. art. VIII, § 1(d) (providing for local elections of county sheriffs and prohibiting county from "transfer[ing] the duties of [the sheriff] to another officer or office").  Unlike prosecutors, sheriffs have independent authority to make arrests.  Fla. Stat. § 30.15(g); *see Hufford v. Rodgers*, 912 F.2d 1338, 1341–42 (11th Cir. 1990) (Florida law evinces "no intent for state officials to control or supervise the sheriff").  Other law-enforcement officials exercise the same degree of independence, with

---

[3] In its preliminary injunction order, the court mistakenly asserted that the Attorney General—rather than the Governor—has the power to remove local officials.  *Compare* Doc. 67 at 39, *with* Fla. Stat. § 908.107(1) ("Any ... state, county, or municipal officer who violated his or her duties under this chapter may be subject to action ***by the Governor***, including potential suspension from office." (emphasis added)).

leadership selected through local governmental processes rather than state appointment. *E.g.*, City of Miami Charter § 42-2 (police chief appointed by city manager).

Even statewide law-enforcement agencies operate beyond the Attorney General's unilateral control. While he sits as one member on a multi-member board that oversees the Florida Department of Law Enforcement ("FDLE") and the Florida Highway Patrol, this board operates by majority vote. Fla. Stat. §§ 20.201, 20.24; *see Support Working Animals, Inc. v. Governor of Fla.*, 8 F.4th 1198, 1204 & n.4 (11th Cir. 2021) (noting the Attorney General does not exercise control over FDLE by nature of this relationship).

## II. FACTUAL AND PROCEDURAL BACKGROUND

In 2024 alone, U.S. Border Patrol encountered nearly 2.5 million unauthorized aliens (a historic high), with many more escaping undetected into the interior of the country.[4] Florida, like the rest of the country, has struggled to address harms flowing from this unprecedented

---

[4] Muzaffar Chishti, Kathleen Bush-Joseph, Colleen Putzel-Kavanaugh, and Madeleine Greene, *Biden's Mixed Immigration Legacy*: *Border Challenges Overshadowed Modernization Advances*, Migration Policy Institute (Dec. 10, 2024), https://tinyurl.com/yjrt45vc.

surge in illegal immigration.  *See, e.g.*, Fla. Exec. Order No. 23-03 (Jan. 6, 2023); Fla. Exec. Order No. 25-120 (June 2, 2025).

As part of its response to this crisis, the Florida Legislature passed, and the Governor signed into law, Senate Bill 4-C.  *See* Fla. Laws Ch. 2025-2 (codified at Fla. Stat. §§ 811.102, 811.103).  That law creates two state crimes, both of which conform to federal law.  The first provision prohibits "unauthorized alien[s]" from "knowingly enter[ing]" Florida after entering the country by evading "inspection by immigration officers."  Fla. Stat. § 811.102(1); *see* 8 U.S.C. § 1325(a) (same).  The second criminalizes the entry or presence of "unauthorized alien[s]" in Florida when the federal government has "denied admission, excluded, deported, or removed" the alien or when the alien "departed the United States during the time an order of exclusion, deportation or removal is outstanding."  Fla. Stat. § 811.103(1); *see also* 8 U.S.C. § 1326(a) (same).

On April 2, 2025, Plaintiffs sued to enjoin these laws, naming as defendants only prosecutorial officials: the Florida Attorney General, the statewide prosecutor, and each judicial circuit's state attorney.  Doc. 1 at 6–7.  Plaintiffs chose not to sue any law-enforcement agencies or officers.

On April 4, Plaintiffs moved for a temporary restraining order and a preliminary injunction. Doc. 4. Within two days, the district court granted an ex parte temporary restraining order ("TRO") barring "Defendants and their officers, agents, employees, attorneys, and any person who are in active concert or participation with them from enforcing" sections 811.102–.103. Doc. 28 at 14.

On April 18, the district court extended the termination date of the TRO and instructed that it should be "interpreted to include" any "law enforcement officer with power to enforce" sections 811.102–.103—i.e., more than 43,000 officers[5] who are not parties to the case. Doc. 49 at 1 ("April 18 Order"). Presumably because non-parties do not receive service via the case docket, the district court directed Defendants to "**IMMEDIATELY** provide actual notice of the TRO" to the enjoined non-parties. *Id.* at 2 (emphasis in original). The court also directed the parties to submit supplemental briefing on the "proper scope of the TRO/PI by April 23, 2025." *Id.* (emphasis omitted).

---

[5] *See* Fla. Dept. of L. Enforcement, *Criminal Justice Agency Profile Report* (last visited Oct. 30, 2025), https://tinyurl.com/3j2c7d9f (reporting that, in 2024, Florida municipal departments employed 20,225 officers and county sheriffs employed 23,407 officers).

The Attorney General complied.  That same day, he sent a letter to all law-enforcement agencies that attached a copy of the TRO and stated that the district court ruled it "covers all law enforcement officers in the State of Florida."  Doc. 57-2 at 1 ("April 18 Letter").  The Attorney General further stated: "Please instruct your officers and agents to comply with Judge Williams' directives."  *Id.* at 2.

Because this was the first notice of the suit to these non-parties, the Attorney General also provided the context of his litigating position in defense of state law: he expressed his view that the order was "both wrong on the merits and overbroad in scope."  *Id.* at 1.  He further explained what would happen next in the lawsuit: he would file an additional brief, just as the court ordered.  *Id.*  Speaking to his fellow State officials about defending State law, he pledged to "continue to press these scope-of-relief arguments in the district court" and, if necessary, on appeal to "the U.S. Court of Appeals for the Eleventh Circuit."  *Id.*

In the following days, the news media mistakenly reported that it was the State's Attorney General, rather than the federal district court, who ordered Florida law enforcement not to enforce State statutes the Legislature had just enacted and that the Attorney General supported.

13

*See James Uthmeier orders pause to immigration arrests after judge's ruling*, FLORIDA POLITICS (Apr. 19, 2025), https://tinyurl.com/45cxx67d ("Florida's Attorney General has ordered immigration officials to stand down on enforcing a state law."); Ana Ceballos, *Florida attorney general tells cops to stop immigration arrests, obey federal judge*, MIAMI HERALD (Apr. 21, 2025), https://tinyurl.com/294u4863 ("Florida Attorney General James Uthmeier has directed state law enforcement officers to stand down on enforcing a new state immigration law.").

On April 23, 2025, the Attorney General filed the court-ordered supplemental brief on the permissible scope of the TRO. Doc. 56. As presaged in his April 18 Letter, the Attorney General challenged the TRO as "overbroad" and argued that the district court "lack[ed] equitable authority to enjoin" non-parties. *Id.* at 2, 15. The brief also explained Florida's governmental structure, which does not grant the Attorney General the authority to "control" independent law-enforcement agencies. *Id.* at 9. The Attorney General explained that "law-enforcement agencies are independent and distinct from prosecutorial agencies under Florida's constitutional scheme," *id.* at 6, that many law-enforcement agencies are either directly elected by local constituencies or

14

appointed by local government, *id.* at 8, and that his office does not exercise any managerial authority over local law-enforcement agencies to hire, fire, or discipline personnel, *id.* at 7–8.

Having filed the brief he forecast in the April 18 Letter, the Attorney General, that same day, sent "an update" to the non-party law-enforcement agencies that were now ensnared in the litigation but were not otherwise receiving service of court filings. Doc. 57-1 (the "April 23 Letter"). That letter conveyed four messages:

1.  It twice reiterated the April 18 Letter's notice of the TRO. *Id.* ("I notified you that U.S. District Judge Kathleen M. Williams believed all law enforcement agencies in Florida were bound by an *ex parte* temporary restraining order she issued on April 4, 2025…."); *id.* ("Judge Williams ordered my office to notify you of the evolving scope of her order, and I did so.").

2.  It referenced the April 18 Letter's promise of a forthcoming brief, alerted the enjoined non-parties that the Attorney General had filed that brief, and explained the litigating position taken in that brief. *Id.* ("Today, my office filed a brief explaining why her order cannot possibly restrain Florida's

law enforcement agencies from enforcing Florida Statutes Sections 811.102 and 811.103."); *id.* ("As set forth in the brief my office filed today, it is my view that no lawful, legitimate order currently impedes your agencies from continuing to enforce Florida's new illegal entry and reentry laws.").

3. It pledged to "continue to argue that position—including on appeal as soon as possible." *Id.*

4. Finally—in light of (i) the public confusion about the source of the nonenforcement order, and (ii) the just-filed brief's explanation about the structure of Florida's government—the Attorney General stated: "***I*** cannot prevent you from enforcing §§ 811.102 and 811.103, where there remains no judicial order that properly restrains you from doing so." *Id.* (emphasis added).

Six days later, the district court issued an order that, for the first time, explained its reasoning for expanding its injunction to include tens of thousands of non-party law-enforcement officers.  Doc. 67 at 37–47.[6]

---

[6] This omnibus order also granted the Plaintiffs' motion for a preliminary injunction and granted in part and denied in part Plaintiffs' motion for class certification.  Doc. 67.

The district court concluded that, even though county and municipal law-enforcement officials are independently elected or appointed, they are nevertheless agents of the Attorney General who, the court said, exercises "control" and "structural authority" over them. *Id.* at 40–41. Separately, the district court characterized the April 23 Letter as a "misstatement" and ordered the Attorney General to "show cause why he should not be held in contempt or sanctioned for violating this Court's TRO." *Id.* at 40 n.25, 48 (emphasis omitted).

The Attorney General responded on May 12, explaining that he had fully complied with his obligation to provide actual notice by sending his April 18 Letter. Doc. 81 at 1–2. The Attorney General explained that the April 23 Letter did not withdraw that notice (nor could it), and that the April 18 Order did not prohibit—much less clearly prohibit—him from expressing his view, as argued in his briefing, that the TRO was overbroad and unlawful. *Id.* at 2. In their response brief, Plaintiffs conceded the April 18 Letter did "provide 'actual notice'" but argued the April 23 Letter "effectively undid the notice." Doc. 87 at 1; *see id.* at 7–15. Plaintiffs also argued the April 23 Letter was contumacious because it "encouraged law enforcement to violate" the TRO. *Id.* at 15.

17

On June 17, 2025, the district court issued its order on contempt. First, the district court rejected Plaintiffs' argument that the April 23 Letter encouraged law enforcement to violate the TRO, explaining that "there is no record evidence of any violative arrests or prosecutions since April 18, 2025" and finding the Attorney General's "statements would not have risen to the level of providing material support if there had been." Order at 12 n.10. Second, the district court acknowledged that, through the April 18 Letter, the Attorney General "complied with the actual notice mandate." *Id.* at 4.

With those direct theories of contempt correctly dispatched, the district court was left with a bank-shot theory. It concluded that the April 23 Letter "effectively rescind[s]" the "previous notice." *Id.* at 19. The court came to this conclusion because (i) the April 23 Letter "recharacterized the April 18th Order as the Court's 'belie[f],' rather than the Court's 'order,'" and (ii) the "second paragraph of the letter … is a direct contradiction of his prior notice … crafted to reverse officers' understanding of whether they are bound by the TRO." *Id.* at 15–16.

The court rejected all mitigating facts and contrary interpretations of the April 23 Letter. <u>First</u>, the court held that "the absence of any

confirmed arrests in violation of the TRO since the April 18th Order" did not matter because, while the court was "encouraged," "the 'reaction of the recipients' is but one of many factors" the Court considered. *Id.* at 16 n.11. Second, the court opined that if the Attorney General wanted to "clarif[y] that law enforcement are enjoined pursuant to the Court's authority, not his," then "he should have said exactly that rather than characterize the Court's order as illegitimate." *Id.* at 17–18. Third, the court rejected the Attorney General's argument, that the April 23 Letter stated that law enforcement were "bound by an *ex parte* temporary restraining order," as "grasping at semantic straws." *Id.* at 18. Fourth, the court held that rules for statutory interpretation should be applied to an open letter from a state attorney general to law-enforcement officers, and thus the last sentence of the letter cannot be read to "lay[] out the arguments made in [the Attorney General's] brief" because the sentence would be "wholly redundant" of an earlier sentence in the letter. *Id.* at 18 n.12 (citing Antonin Scalia & Bryan A. Garner, READING LAW (2012) as articulating the rule for interpreting the letter). Finally, the court rejected that separation-of-powers or federalism concerns required it to demonstrate any "special solicitude" before finding a state attorney

general's out-of-court statements about official matters to be contumacious. *Id.* at 21–23.

Despite disclaiming any inquiry into the Attorney General's "subjective intent," *id.* at 20, and despite claiming to be "unconcerned with Uthmeier's criticism and disapproval of the Court and the Court's Order," *id.* at 23, the district court closed its order by comparing the sitting Attorney General of Florida to the fictional character Humpty Dumpty, who "in rather a scornful tone" had declared his right to redefine words. *Id.* at 26 (quoting Lewis Carroll, THROUGH THE LOOKING-GLASS, AND WHAT ALICE FOUND THERE (1871)). Having found the Attorney General in contempt, the district court ordered him to file bi-weekly status reports "detailing whether any" enforcement actions relating to sections 811.102–.103 had occurred. *Id.* This appeal followed. Doc. 101.

## STANDARD OF REVIEW

"This Court reviews a finding of civil contempt for abuse of discretion." *In re Managed Care*, 756 F.3d 1222, 1232 (11th Cir. 2014). A district court abuses its discretion if it has "ma[de] findings of fact that are clearly erroneous," "has made a clear error of judgment, or has applied the wrong legal standard." *Id.* On "appellate review, a civil

20

contempt order may be upheld only if the proof of the defendant's contempt is clear and convincing." *McGregor v. Chierico*, 206 F.3d 1378, 1383 (11th Cir. 2000). "This clear and convincing proof must also demonstrate that 1) the allegedly violated order was valid and lawful; 2) the order was clear, definite and unambiguous; and 3) the alleged violator had the ability to comply with the order." *Id.* This Court "construe[s] any ambiguities or uncertainties in such a court order in a light favorable to the person charged with contempt." *FTC v. Leshin*, 618 F.3d 1221, 1231 (11th Cir. 2010) (quoting *Ga. Power Co. v. NLRB*, 484 F.3d 1288, 1291 (11th Cir. 2007)). Clear and convincing evidence does not support a contempt order when "there is [a] *fair ground of doubt* as to the wrongfulness of the defendant's conduct." *Taggart v. Lorenzen*, 587 U.S. 554, 561 (2019).

Whether the district court failed to apply the correct legal standard is a "question of law for *de novo* review." *United States v. Coulton*, 594 F. App'x 563, 565 (11th Cir. 2014).

## SUMMARY OF THE ARGUMENT

**I.** The Supreme Court has held that contempt does not lie "where there is a fair ground of doubt as to the wrongfulness of the defendant's

conduct." *Taggart v. Lorenzen*, 587 U.S. 554, 561 (2019) (simplified).  The district court refused to apply this standard, erroneously dismissing it as "dicta."

**II.** The district court's refusal to entertain any fair ground of doubt was evident in how it chose to read the Attorney General's April 23 Letter.  Fairly read, in that letter, the Attorney General conveyed four messages: (1) he reiterated the existence of the TRO that "bound" non-party law enforcement; (2) he explained "my view" of the TRO as expressed "in the brief my office filed today," including that the order was "wrong," not "legitimate," and not "lawful"; (3) he pledged to pursue that position on appeal; and (4) he clarified that he—as opposed to the court—did not have the power to prevent enforcement of sections 811.102–.103.  The district court, however, rejected this reading and interpreted the letter to revoke the actual notice of the TRO that the Attorney General had previously provided.  To support that reading, the court had to draw every inference against the Attorney General, including by altering the actual text of the letter to make it seem as if the Attorney General said there was no lawful, legitimate order *at all* rather than describing the argument he had made in his brief.  These faulty interpretive moves show

22

that there was a fair ground of doubt, and a lack of clear and convincing evidence, as to whether the Attorney General violated the April 18 Order.

**III.** The April 18 Order only required the Attorney General to provide actual notice of the TRO, which he did. In the contempt order, the district court went further, stating that the "purpose" of the April 18 Order could be met only if the Attorney General was responsible for how law-enforcement officers understood the order. But contempt only lies if there is a violation of "clearly and specifically describe[d] … impermissible conduct." *SEC v. Goble*, 682 F.3d 934, 952 (11th Cir. 2012). In other words, the court read the April 18 Order as requiring the Attorney General to monitor his criticism and arguments about the TRO to ensure they do not affect non-parties' "understanding" of the TRO. That requirement is not at all clear in the underlying order, and the district court thus erred in holding the Attorney General in contempt.

**IV.** This case warranted special solicitude for the sensitive separation-of-powers and federalism implications of using contempt to punish a state attorney general for out-of-court speech about official state business. *See In re Attorney Gen. of U.S.*, 596 F.2d 58, 64 (2d Cir. 1979) ("a contempt sanction imposed on the Attorney General in his official

23

capacity has greater public importance, with separation of power overtones, and warrants more sensitive judicial scrutiny than such a sanction imposed on an ordinary litigant"); *Trump v. United States*, 603 U.S. 593, 629 (2024) (recognizing that the "power [to] us[e] the office's 'bully pulpit' to persuade" is concomitant with the duty to "execut[e] the laws"). Yet rather than apply "the most sensitive judicial scrutiny" out of respect for the separation of powers and federalism, *J.G.G. v. Trump*, 147 F.4th 1044, 1064 (D.C. Cir. 2025) (Rao, J., concurring) (simplified), the district court dismissed these concerns as "misplaced." Affirming this error would have serious implications for the constitutional balance of power, leaving state officials to censor speech—including speech critical of another branch—that is their constitutional prerogative to assert.

## ARGUMENT

A district court must exercise the "potent weapon" of its contempt power, *Taggart v. Lorenzen*, 587 U.S. 554, 560 (2019), with caution and self-restraint. As the Supreme Court has explained:

> [T]he contempt power … is liable to abuse. Unlike most areas of law, where a legislature defines both the sanctionable conduct and the penalty to be imposed, civil contempt proceedings leave the offended judge solely responsible for identifying, prosecuting, adjudicating, and sanctioning the contumacious conduct. Contumacy often strikes at the most

vulnerable and human qualities of a judge's temperament, and its fusion of legislative, executive, and judicial powers summons forth the prospect of the most tyrannical licentiousness.

*Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 831 (1994) (simplified).

Here, the district court eschewed that caution, choosing at every turn to interpret the speech at issue, and controlling precedent, only in a way that could support a contempt finding, and rejecting all other reasonable (and correct) explanations or interpretations. Respectfully, it appears that the district judge succumbed to "the most vulnerable and human qualities," permitting personal offense to produce an erroneous outcome. *Id.* Indeed, while the district court purported to be "unconcerned with Uthmeier's criticism and disapproval of the Court and the Court's order," Order at 23, the Order suggests otherwise—from its revelation of the court's exhaustive personal monitoring of the Attorney General's (non-record) social-media posts and press interviews,[7] *id.* at 7–10, to its refusal to address the Attorney General by his title, *id.* at

---

[7] This district court has displayed a pattern of independently monitoring, and raising sua sponte, the Attorney General's non-record social-media posts and press interviews. *See Friends of the Everglades v. Noem*, No. 25-cv-22896, Doc. 129 at 244:2–246:2 (S.D. Fla.).

*passim*, to its derisive comparison of the State's chief legal officer to "Humpty Dumpty," *id.* at 26. This Court—viewing matters with the objectivity required for the potent weapon of contempt—should reverse the contempt order. Indeed, an affirmance of the contempt order here would have grave implications for the constitutional separation of powers. This Court should not sanction that encroachment.

## I.    THE DISTRICT COURT APPLIED THE WRONG LEGAL STANDARD

"[C]ivil contempt 'should not be resorted to where there is [a] *fair ground of doubt* as to the wrongfulness of the defendant's conduct.'" *Taggart v. Lorenzen*, 587 U.S. 554, 561 (2019) (quoting *Cal. Artificial Stone Paving Co. v. Molitor*, 113 U.S. 609, 618 (1885)). This "rigorous" standard, *In re Roth*, 935 F.3d 1270, 1278 (11th Cir. 2019), permits civil contempt only if "there is no objectively reasonable basis for concluding that [the defendant's] conduct might be lawful under [the court's] order," *Taggart*, 587 U.S. at 560. This standard "reflects the fact that civil contempt is a severe remedy, and that principles of basic fairness require that those enjoined receive explicit notice of what conduct is outlawed before being held in civil contempt." *Id.* at 561 (simplified). Consistent with this long-tenured rule, this Court has recognized that contempt is

26

appropriate only when there is no fair ground of doubt that the defendant committed a wrongful act. *E.g.*, *In re Roth*, 935 F.3d at 1275 ("a court may hold a creditor in civil contempt for violating a discharge order if there is *no fair ground of doubt* as to whether the order barred the creditor's conduct" (simplified)); *In re Grant-Carmack*, No. 23-11817, 2024 WL 1433714, at *3–4 (11th Cir. Apr. 3, 2024) (concluding lower court did not err in refusing contempt "because there was a fair ground of doubt as to" the wrongfulness of defendant's conduct); *In re Loder*, 796 F. App'x 698, 700 (11th Cir. 2020) (quoting "fair ground of doubt" test).

Confining its analysis to a footnote, the court below refused to apply the fair-ground-of-doubt rule, characterizing it as an "additional hurdle" that (oxymoronically) is "dicta from an 1885 case" and not supported by Eleventh Circuit case law. Order at 11 n.9. The court erred in refusing to apply this binding Supreme Court precedent.

<u>First</u>, as *Taggart* explained, there is nothing "new" about the fair-ground-of-doubt rule. Instead, it is "old soil" and the "traditional standard[] in equity practice for determining when a party may be held in civil contempt for violating an injunction." 587 U.S. at 561. *See also id.* at 562 (describing the rule as a "traditional civil contempt

27

principle[]"). Thus, far from being the "additional hurdle" described by the district court, Order at 11 n.9, the fair-ground-of-doubt rule is the longstanding hurdle that must be cleared before a district court may exercise the "'potent weapon' of civil contempt," *Taggart*, 587 U.S. at 560 (quoting *Int'l Longshoremen's Ass'n, Local 1291 v. Phila. Marine Trade Ass'n*, 389 U.S. 64, 76 (1967)).

Second, the rule is not "dicta" that may be ignored by a district court. Again, *Taggart* described the rule as a "traditional standard[]" that "has long governed how courts enforce injunctions." *Id.* at 560–61. Deriving the general standard for civil contempt was a critical part of *Taggart*'s reasoning, and thus a holding. *See* Bryan Garner, The Law of Judicial Precedent 48 (2016). As the district court acknowledged, but then inexplicably ignored, *Taggart* was "applying well-established civil contempt principles." Order at 11 n.9.

Ignoring the unequivocal, binding language of *Taggart* itself, the district court confined its "dicta" analysis to *Taggart*'s underlying citation of *Molitor*. As just explained, the rule in *Taggart* is not dicta, so there is no need to assess *Molitor*. But the district court was not even correct about *Molitor*. There, the plaintiff alleged the defendant violated an

28

injunction and sought contempt. 113 U.S. at 610, 612–14. The question before the Supreme Court was whether contempt was a pure question of law (because only such questions were immediately appealable to the Supreme Court at the time). *Id.* at 615–16. The *Molitor* Court concluded the contempt question was "a mixed question of fact and law," *id.* at 617, and to reach that conclusion, the Court had to define the contempt standard, *id.* at 618. That is why *Molitor* explained that "contempt is a severe remedy, and should not be resorted to where there is fair ground of doubt as to the wrongfulness of the defendant's conduct." *Id.* That holding was central to the reasoning of the case, not mere dicta: the Court could only conclude that contempt presented a mixed question by analyzing the standard for contempt.

The district court cited nothing to support its relegation of *Taggart* and *Molitor* to dicta. Nor could it. Court after court has treated the "fair ground of doubt" test as part of *Molitor*'s holding. *E.g., TiVo Inc. v. EchoStar Corp.*, 646 F.3d 869, 881–82 (Fed. Cir. 2011) (en banc); *Latino Officers Ass'n City of N.Y., Inc. v. City of New York*, 558 F.3d 159, 164 (2d Cir. 2009); *Fox v. Capital Co.*, 96 F.2d 684, 686 (3d Cir. 1938); *Am. Foundry & Mfg. Co. v. Josam Mfg. Co.*, 79 F.2d 116, 118 (8th Cir. 1935).

So has the United States.  *See* Br. for U.S., *Taggart v. Lorenzen,* 2019 WL 991072, at \*14–15 (U.S. Feb. 26, 2019) (describing the "fair ground of doubt" standard as a "fundamental principle" derived from *Molitor*).  And so have scholars.  *E.g.*, F. Andrew Hessick & Michael T. Morley, *Interpreting Injunctions*, 107 VA. L. REV. 1059, 1085 (2021) ("The U.S. Supreme Court has consistently embraced this notice principle as well, holding more than a century ago that, because 'contempt is a severe remedy,' courts should not resort to it 'where there is fair ground of doubt as to the wrongfulness of the defendant's conduct.'").  There was, in short, no support for the district court's footnote conclusion that the fair-ground-of-doubt test is "new," "additional," or "dicta" to be cast aside.

Third, the district court hinted that this Court has ignored *Taggart*.  Order at 11 n.9.  Of course, this Court cannot ignore Supreme Court precedent.  And it has not.  For one, this Court has repeatedly invoked *Taggart*'s standard.  *See In re Roth*, 935 F.3d at 1275–76, 1278; *In re Grant-Carmack*, 2024 WL 1433714, at \*3–4; *Sellers v. Rushmore Loan Mgmt. Servs., LLC*, 941 F.3d 1031, 1041 n.6 (11th Cir. 2019); *In re Loder*, 796 F. App'x at 700.  Nor do the district court's cited cases reject *Taggart*.  For example, in *Peery v. City of Miami*, 977 F.3d 1061 (11th Cir. 2020),

30

this Court explained that contempt must be shown by "clear and convincing evidence" that proves "(1) the allegedly violated order was valid and lawful; (2) the order was clear and unambiguous; and (3) the alleged violator had the ability to comply with the order." *Id.* at 1076–77. The Court added that "any ambiguities" are construed "in favor of the party charged with contempt." *Id.* at 1077. The district court read that mine-run recitation of the elements as rejecting *Taggart*. Order at 11 n.9 (collecting cases like *Peery* that recount the elements of contempt). But reciting the elements does not reject *Taggart* because *Taggart* did not change the elements. Instead, *Taggart* establishes a threshold for determining ambiguity: if there is any "fair doubt" that the defendant's conduct was wrongful, then an ambiguity exists, and contempt is improper. *See, e.g.*, *Bruce v. Citigroup Inc.*, 75 F.4th 297, 306 (2d Cir. 2023) (explaining that "*Taggart* provides the yardstick to measure" the elements of contempt); *Static Media LLC v. Leader Accessories LLC*, 38 F.4th 1042, 1045–46, 1047, 1049 (Fed. Cir. 2022) (applying *Taggart* to test the elements).

## II.    THE APRIL 23 LETTER DID NOT VIOLATE THE APRIL 18 ORDER BY "NEGATING THE NOTICE" PREVIOUSLY PROVIDED

The district court correctly recognized that the Attorney General fully "complied" with the April 18 Order because, through the April 18 Letter, he "'IMMEDIATELY provide[d] actual notice of the TRO'" to non-party law enforcement.  Order at 4 (quoting April 18 Order at 2).  The district court also correctly concluded the Attorney General had not "violated the TRO by enforcing or instructing law enforcement to enforce S.B. 4-C, or by aiding and abetting any actual violation."  Order at 12–13 n.10.  Thus, in the district court's view, the "only question," remaining was whether the April 23 Letter "negated the notice" already provided.  *Id.* at 14.  It did not.

To be sure, the Attorney General, in the April 23 Letter and elsewhere, was sharply critical of the TRO and especially its extension to 43,000 non-parties.  That criticism, however, was not contumacious.  Indeed, it was part of a long-running public debate over whether federal district courts have been overstepping their equitable authority, with even a Supreme Court majority opinion—issued just two months later— leveling vehement criticism of such judicial overreach.  *See Trump v. CASA, Inc.*, 606 U.S. 831, 858–59 (2025) ("We will not dwell on Justice

32

Jackson's argument, which is at odds with more than two centuries' worth of precedent, not to mention the Constitution itself.  We observe only this: Justice Jackson decries an imperial Executive while embracing an imperial Judiciary…. Justice Jackson would do well to heed her own admonition: '[E]veryone, from the President on down, is bound by law.' That goes for judges too." (citation omitted)).

But that criticism did not undo notice of the TRO.  Fairly read, in the April 23 Letter, the Attorney General conveyed four messages, and none of them "negated the notice."  The Attorney General: (1) reiterated the existence of the TRO that "bound" non-party law enforcement; (2) explained "my view" of the TRO as expressed "in the brief my office filed today," including that the order was "wrong," not "legitimate," and not "lawful"; (3) pledged to pursue that position on appeal; and (4) clarified that he—as opposed to the district court—did not order non-enforcement of important State laws.  Doc. 57-1.

Rather than draw those four messages from the April 23 Letter, the district court concluded the letter was "crafted to reverse officers' understanding of whether they are bound by the TRO."  Order at 16.  For a host of reasons, that is not the correct reading of the letter—and it is

certainly not the *only* plausible reading, which it would need to be to remove a "fair ground of doubt as to the wrongfulness of the defendant's conduct." *Taggart*, 587 U.S. at 561 (emphasis omitted). Accordingly, the finding of contempt was improper.[8]

**1.** The district court deemed "the remarks in the second paragraph of the letter" (or, really, the last two sentences of that paragraph) to be "the heart of th[e] inquiry" into contempt. Order at 16. Yet to arrive at the conclusion that those two sentences vitiated notice, the court had to close its eyes to the actual evidence before it—i.e., it ignored fair grounds of doubt that foreclose any clear and convincing evidence of contempt.

***a.*** As an initial matter, isolating snippets of the letter, rather than reading it as a whole, was a failure to apply the fair-ground-of-doubt rule because the one-page document was intended by the Attorney General— and would have been read by recipients—as a unified communication. Indeed, the district court recognized, but failed to apply, the principle that a court should "consider the entire text" when deriving its meaning.

---

[8] Even if, like the district court, one ignores the *Taggart* formulation, the points below show that there was no "'clear and convincing evidence that [the] order was violated.'" Order at 10–11 (quoting *Jove Eng'g, Inc. v. IRS*, 92 F.3d 1539, 1545 (11th Cir. 1996)).

Order at 18 n.12 (quoting READING LAW, *supra*, at 167).  That the court had to ignore parts of the letter—its *two* reminders of the TRO—to reach its contempt conclusion means the court necessarily ignored a fair ground of doubt about how to interpret the second of only two paragraphs.

**b.**  The district court concluded that the last two sentences of the letter were a "direct contradiction" of the prior notice.  Order at 16.  Incredibly, however, the district court could support that conclusion only by eliding and altering the text of the sentences at issue.

Here is how the district court quoted those lines, with the court's key change emphasized:

> "I cannot prevent you from enforcing [S.B. 4-C], where there remains no judicial order that properly restrains you from doing so**… [, and]** it is my view that no lawful, legitimate order currently impedes your agencies from continuing to enforce' the law."

Order at 6.  But here are the sentences the Attorney General wrote, with the excised text emphasized:

> "I cannot prevent you from enforcing §§ 811.102 and 811.103, where there remains no judicial order that properly restrains you from doing so.  **As set forth in the brief my office filed today,** it is my view that no lawful, legitimate order currently impedes your agencies from continuing to enforce Florida's new illegal entry and reentry laws."

Thus, in the actual letter, the Attorney General made clear that he was reporting his view "[a]s set for in the brief" he filed—i.e., the argument he was making in court about the legality of an existing order. But the district court's altered quotation eliminates the reference to the brief to make it seem as if the Attorney General said there was no lawful, legitimate order *at all*. Thus, when the district court concluded "it is difficult to imagine language better crafted to reverse officers' understanding of whether they are bound by the TRO short of 'I hereby revoke my actual notice of April 18, 2025 and inform you that no court order prohibits your enforcement of S.B. 4-C,'" Order at 16, the court was referring to the language *it* crafted through a misleading alteration, not to the language the Attorney General actually used. In other words, the district court erroneously ignored (through its alteration) evidence that would provide a fair ground of doubt (or foreclose clear and convincing evidence) as to the wrongfulness of the Attorney General's statements.

***c.*** The district court further refused to read the last sentence of the letter as "lay[ing] out the arguments made in [the] brief" because that "would make the sentence wholly redundant, given the first paragraph

36

of the letter." Order at 18 n.27 (citing the whole-text canon from READING LAW, *supra*, at 167).  That conclusion is flawed for several reasons.

First, it doubles down on the inexplicable elision of the phrase "[a]s set forth in the brief my office filed today."  Redundant or not, that phrase exists and cannot be ignored.

Second, there is no justification for subjecting a public letter from an attorney general to the canons of statutory interpretation.  The letter was not a formal legal instrument like a statute or contract.  *See* READING LAW, *supra*, at 179 (surplusage canon is for a "legal instrument").  Instead, it was an "update" message from an executive-branch official to other State officials—messaging the Attorney General made available to the general public.  Repetition for emphasis is not just plausible, but a common feature of such writing.  *See, e.g.*, H.W. Fowler, A DICTIONARY OF MODERN ENGLISH USAGE 517 (2d ed. 1965) ("The first thing that may be said is that a dozen sentences are spoilt by ill-advised avoidance of repetition for every one that is spoilt by ill-advised repetition."); Robert P. Warren, *Fundamentals of Good Writing*, at 22 (1950) (one "means of emphasis" is "repetition of an idea [which] can give it prominence").  Indeed, legal advocates often use repetition in presenting their

arguments; it is even enshrined in a rule of this Court, which requires a brief to have a summary of argument along with an argument.  In persuasive legal and political communications, repetition does not suggest surplusage the way it might in a formal legal instrument.

Third, even if it were appropriate to rely on a canon of statutory interpretation in this context, the district court, in its zeal to find contempt, ignored the "principle[] of interpretation," "derived from the whole-text canon," that "provisions should be interpreted in a way that renders them compatible rather than contradictory."  READING LAW, *supra*, at 168.  If the Attorney General wanted to state that the TRO was no longer in effect, it would have made no sense for him to twice reference (once in each paragraph of the letter) the existence of the TRO and his brief "explaining why" it was erroneous.  Indeed, by claiming redundancy, the district court conceded that the first paragraph of the letter conveys that the TRO still exists and the Attorney General filed a brief attacking it.  How, then, could the entire letter be fairly read to revoke notice of the existence of that very TRO?

**d.**  The district court rejected the notion that the second paragraph of the letter could be read to convey the Attorney General's "position that

38

he does not control [law enforcement] because he is not a judicial officer or because law enforcement agencies are independent from the Attorney General under Florida's constitutional and statutory framework."  Order at 18.  In the court's view, if the Attorney General wanted to convey these messages, "he should have said exactly that rather than cast the Court's order as illegitimate."  *Id.*  That is an insufficient—and, frankly, dangerous—basis for holding a State's chief legal officer in contempt.

First, the April 18 Order required the Attorney General only to provide notice of the TRO.  It said nothing about how the Attorney General could convey messages regarding his own power, either in relation to the order or in relation to Florida law.  Thus, the court had no basis, through a contempt order, to rule as to "exactly" which words the Attorney General should have used to convey these messages.  *Id.*

Second, even if that were not the case, the court's conclusion that "cast[ing]" a court order as "illegitimate"[9] is contumacious (or somehow violates legal ethics, *see* Order at 23 n.16) would ensnare many politicians and citizens into a contempt trap—and would surely violate the First

---

[9] Once again, the district court seized on a word not actually found in the April 23 Letter.

Amendment. Former Attorney General Eric Holder, for example, routinely lambastes the Supreme Court as "illegitimate" and a "broken institution."[10]  And he is hardly alone.  Take, for instance, Senator Ed Markey, Representative Rashida Tlaib, or the former Chair of the Democratic National Committee, all lawyers who castigated as "illegitimate" the decision in *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022).[11]  Even Plaintiffs' counsel in this very case, the ACLU, is no stranger to harshly criticizing federal court orders, including by calling them "lawless."[12]  All of this is permissible.  In our

---

[10] *See Eric Holder Calls on Democrats to Reform Supreme Court*, POLITICAL WIRE (Nov. 4, 2025), https://tinyurl.com/3zzwbcvp; Khaleda Rahman, *If GOP Creates 'Illegitimate Majority' on Supreme Court, More Justices Should be Added: Former U.S. Attorney General*, NEWSWEEK (Sept. 20, 2020), https://tinyurl.com/5au2v48z.

[11] *See Senator Markey Statement on the Overturning of* Roe v. Wade (June 24, 2022), https://tinyurl.com/4zfmwa2y (Markey: "A stolen, illegitimate, and far-right majority on the Supreme Court has destroyed nearly fifty years of precedent…."); Ramesh Ponnuru, *Democrats Have a Decision to Make About the Supreme Court*, WASH. POST (July 14, 2025), https://tinyurl.com/59tcuvhu (Tlaib: "This illegitimate SCOTUS continues to do Trump's bidding.  We need to end this court's corrupt grip on our democracy."); Caitlin McFall, Roe v. Wade *abortion decision: Democrats call Supreme Court 'illegitimate,'* FOX NEWS (June 24, 2022), https://tinyurl.com/567x454n (DNC Chair Jaime Harrison: "It isn't up to … this illegitimate court … to decide what happens to a woman's body…. [T]hat choice belongs to a woman and no one else.").

[12] *See, e.g.*, *Breaking: TPS Holders and Advocates Denounce Supreme Court Ruling*, ACLU (Oct. 3, 2025), https://tinyurl.com/5akszs7f

Republic, federal courts—with their life-tenured share of government power—are not immune to criticism, even sharp criticism. As Chief Justice Roberts has explained, this criticism "comes with the territory."[13] The district court nodded to this important principle, professing that it was "unconcerned with Uthmeier's criticism and disapproval," Order at 23, but then demonstrated exactly such concern by basing its contempt finding on its obvious offense at the use of the term "legitimate."

2. The court said "the clear purpose of the April 18th Order was to prevent any … future arrests" under the challenged laws, and "the actual notice requirement was designed to address any law enforcement personnel who might make an arrest" pursuant to those laws. Order at 14. Even if a contempt finding could be based on a violation of an order's

---

(senior staff attorney: The Supreme Court's "decision is heartbreaking, callous, and *lawless*" and "has no basis in law" (emphasis added)); *id.* (National Legal Director: "Once again, the Supreme Court has vitiated a well-reasoned district court opinion, ... throwing aside its standards to green light ... *lawless actions*" and cause "profound ... *damage to the rule of law*." (emphasis added)); *ACLU Comment on Supreme Court Ruling Allowing Indiscriminate ICE Stops in Los Angeles*, ACLU (Sept. 8, 2025), https://tinyurl.com/y4x9jczu (National Legal Director: "The Supreme Court's order is outrageous because it includes no reasoning.... We will fight on this case and others").

[13] *See* Statement of Chief Justice Roberts (Mar. 4, 2020), https://tinyurl.com/bdfxr9mv.

unstated purpose rather than its clear command, *but see infra* Part III, the court erred because it completely discounted evidence that the April 23 Letter did not undermine the April 18 Order's purpose.

The court held that "the absence of any confirmed arrests in violation of the TRO" after the April 23 Letter did "not alter [its] conclusion on contempt." Order at 16 n.11. The court speculated that this effectuation of purpose could not be viewed as "evidence that the April 23rd Letter was not understood by its recipients as a green light to continuing enforcing" sections 811.102–.103 because the lack of arrests "*may well* be in spite of the April 23rd Letter." *Id.* (emphasis added). But such speculation ("may well") is the very definition of "a fair ground of doubt" and a lack of clear and convincing evidence. *See, e.g.*, *Victor v. Nebraska*, 511 U.S. 1, 20 (1994) ("a reasonable doubt is something more than a speculative one"); *Reasonable Doubt*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("reasonable doubt is one for which a sensible reason can be supplied" (quoting Glanville Williams, *Criminal Law: The General Part* 873 (2d ed. 1961))); *Nejad v. Attorney Gen., Ga.*, 830 F.3d 1280, 1289 (11th Cir. 2016) (clear and convincing evidence requires "proof that a claim is highly probable"). In other words, when confronted with

42

evidence that cast doubt on its interpretation of the Attorney General's letter, the court simply ignored it, rather than apply the proper standard.

**3.**  The district court found that one of the "variety of ways" the Attorney General committed contempt in the April 23 Letter was by "recharacterize[ing] the April 18th Order as the Court's 'belie[f],' rather than the Court's 'order.'"  Order at 15.  Again, the district court could reach this conclusion only by eliding and altering the actual language of the letter.  The letter says the district judge "believed all law enforcement agencies in Florida were bound by an *ex parte* temporary restraining **order** she issued on April 4, 2025."  Doc. 57-1 (emphasis added).  Fairly read, this sentence refers to the sequence of events that occurred.  The court issued its TRO on April 4 and then, in a new order on April 18, "interpreted [the TRO] to include" all non-party law-enforcement officers in Florida.  April 18 Order at 1.  That the April 23 Letter used the term "believed" instead of "interpreted" is hardly a basis to conclude the TRO was recharacterized to a "belie[f]," especially because, just a few sentences later, the letter explicitly references that interpretation as "the evolving scope of her **order**."  Doc. 57-1 (emphasis added).  And even without the clarification later in the letter, the difference between

43

"interpreted" and "believed" is hardly sufficient to invoke the potent weapon of contempt. "Believe" means to "hold (something) as an opinion," NEW OXFORD AMERICAN DICTIONARY (3d. ed. 2010), and judicial orders are often characterized as "opinions." *See Opinion*, BLACK'S LAW DICTIONARY (12th ed. 2024) (a "court's written statement explaining its decision in a given case").

**4.** Finally, to support its finding of contempt, the district court relied on statements the Attorney General made during media interviews. Order at 19–20. But these statements do not support the contempt finding for multiple reasons.

<u>First</u>, the show-cause order directed that the Attorney General must "show cause why he should not be held in contempt or sanctions for violating this Court's TRO through sending his April 23, 2025 letter." Doc. 67 at 48 (simplified). The only action at issue was the letter, not any other statement.

<u>Second</u>, in each of the quotations relied upon by the court, the Attorney General stated something like "***I'm*** not going to direct law enforcement to stand down." Order at 19. Because there had been confusion in the media, in these statements, as with the letter, the

Attorney General drew a distinction between what the court ordered and his own authority. The court said these statements "mischaracterize[d] the nature of the Court's actual notice requirement," which "ordered [the Attorney General] to inform law enforcement officers that *the Court* had enjoined their enforcement." Order at 19 n.13 (emphasis added). But that is exactly the point: the Attorney General drew a distinction between what *he* could or would order and what *the court* ordered. That the court itself had to mischaracterize this quote as "a clear proclamation of his refusal to comply with the actual notice mandate," *id.*, once again shows that the court did not accept the evidence as it was but instead distorted it to fit a contempt finding. The bottom line is that in none of these quotes did the Attorney General state that the notice was withdrawn, that the order did not exist, or that parties were not bound by the court's order. He said law enforcement was not bound by *his* authority.

Equally incongruous was the district court's citation of the Attorney General's comments about law enforcement's separate authority to apprehend illegal aliens under 8 U.S.C. § 1357(g)(1). Order at 9. The court said the Attorney General had "conflate[d]" this authority with the enjoined state laws, but he did no such thing. *Id.* at 9 n.6. He said, "if

45

they want to help the Trump administration carry out detentions and deportations, they have the legal authority to do that." *Id.* at 9 (emphasis omitted). It cannot possibly be contumacious for the Attorney General of Florida to discuss in a media interview the separate lawful authority that Florida law enforcement has under federal law to detain illegal aliens. That the district court stretched this far to support its contempt finding is just one more indicator that the demanding standard was not met.

* * * *

At every turn, the district court chose to ignore fair grounds of doubt regarding whether the Attorney General's speech violated the actual-notice requirement of the April 18 Order, including by misquoting his speech to make it appear violative. The April 23 Letter, fairly read, did not revoke notice and, thus, there was no contempt.

## III. THE DISTRICT COURT FOUND CONTEMPT OF A REQUIREMENT NOT CLEARLY IDENTIFIED IN THE APRIL 18 ORDER

Separately, the contempt order was erroneous because it found the Attorney General violated a requirement that was not clearly stated in the April 18 Order. Civil contempt is "unavailable" and "inappropriate" if there is a "fair ground of doubt as to whether the [court's] order barred [the party's] conduct." *In re Roth*, 935 F.3d at 1278 (simplified); *see also*

46

*Trade Well Int'l v. United Cent. Bank*, 778 F.3d 620, 626 (7th Cir. 2015) (contempt requires "a decree" that "sets forth in specific detail an unequivocal command which the party in contempt violated" (quoting *Mañez v. Bridgestone Firestone N. Am. Tire, LLC*, 533 F.3d 578, 591 (7th Cir. 2008))). "Moreover," this Court "will construe any ambiguities or uncertainties in such a court order in a light favorable to the person charged with contempt." *Ga. Power Co. v. NLRB*, 484 F.3d 1288, 1291 (11th Cir. 2007); *Project B.A.S.I.C. v. Kemp*, 947 F.2d 11, 16 (1st Cir. 1991) (same); *see also Ford v. Kammerer*, 450 F.2d 279, 280 (3d Cir. 1971). After all, the point of civil contempt is to "coerce the defendant into compliance with the court's order." *FTC v. Leshin,* 719 F.3d 1227, 1231 (11th Cir. 2013). It would, of course, be unreasonable to hold a defendant in contempt when the underlying order does "not clearly and specifically describe permissible and impermissible conduct" and "does not specifically describe the acts restrained." *Goble*, 682 F.3d at 952 (vacating contempt and remanding for court to "craft terms that provide the defendant *fair notice* of what conduct risks contempt and clearly inform [him] of what he is ordered to do or not do" (emphasis added)).

Here, the underlying order required the Attorney General to "**IMMEDIATELY** provide actual notice of the TRO" to non-party law enforcement. April 18 Order at 2. Thus, the April 18 Order required the Attorney General to forward the TRO to bound non-parties.[14] He did that. *See* Doc. 57-2 (attaching copy of the TRO).

In its contempt order, however, the court went further in defining the supposed requirements of the underlying order. The court relied on the "purpose of the April 18th Order … to prevent any … future arrests" under sections 811.102–.103, and the court charged the Attorney General with the responsibility of ensuring what non-party law-enforcement officers "understand from the information [he] gives them." Order at 14–15. In other words, the district court read the April 18 Order as requiring the Attorney General to monitor his criticism and arguments about the TRO to ensure they do not affect non-parties' "understanding" of the TRO. *Id.* at 16 & n.11. But that requirement is not at all clear in the underlying order, which—again—only required the Attorney General to

---

[14] *See Provide*, NEW OXFORD AM. DICTIONARY 1486 (3d ed. 2010) ("make available for use"); *Amacio v. Gaudiuso*, No. 03-cv-1208, 2005 WL 1593647, at *1 (E.D.N.Y. July 7, 2005) ("actual notice" means "notice given directly to, or received personally by, a party" (quoting BLACK'S LAW DICTIONARY 1090 (8th ed. 2004)).

provide actual notice of the TRO itself. At a minimum, there is a fair reading of the April 18 Order's notice provision that only required the Attorney General to provide the TRO to bound third parties. Because he did that, it was improper to hold him in contempt.

Moreover, the district court wrongly assumed that statements about its order—short of a statement that the order did not exist or had been revoked—could defeat actual notice of the order. That conflicts with a mountain of law that assumes people know the law, which is why "ignorance of law excuses no one." 1 WHARTON'S CRIMINAL LAW § 13:3 (16th ed.); *see also Ratzlaf v. United States*, 510 U.S. 135, 149 (1994) (describing the "venerable principle that ignorance of the law generally is no defense to a criminal charge"). That goes doubly for law-enforcement officials who—while not expected to "know more than reasonable judges about the law," *Barts v. Joyner*, 865 F.2d 1187, 1193 (11th Cir. 1989)—are at least expected to know that court orders must be obeyed. *Cf. Maye v. Klee*, 915 F.3d 1076, 1087 (6th Cir. 2019) ("Put succinctly, reasonable officials follow court orders."). Applied here, the Attorney General provided the non-party law-enforcement officers copies of the court's injunction. They could read it and determine its limits for

themselves.  Nothing the Attorney General said about the TRO—short of saying it was revoked—could undo that notice.

Indeed, even if the Attorney General were the non-party law-enforcement officers' lawyer, his "advice of counsel" would not be "a defense to an act of contempt" if the law-enforcement officer were dragged into court.  *United States v. Goldfarb*, 167 F.2d 735, 735 (2d Cir. 1948); *see also In re Walters*, 868 F.2d 665, 668 (4th Cir. 1989) (advice of counsel is not a defense to civil contempt).  It cannot be that the Attorney General's letter was powerful enough to revoke notice of the TRO, but at the same time would not be powerful enough to show that an unnoticed non-party lacked knowledge.

And that must be the case.  An injunction can only bind those "who receive actual notice" of it.  *ADT LLC v. NorthStar Alarm Servs., LLC*, 853 F.3d 1348, 1351 (11th Cir. 2017).  If the Attorney General's letter really vitiated "actual notice," then non-party law-enforcement officers are not bound by the injunction at all, and violators could not be subject to civil or criminal contempt.  Yet, the district court did not go that far: its remedy recognized the opposite view that law-enforcement officers remain bound.  Order at 25 (explaining that arrests by law-enforcement

officers would be "violative"). The only way to square that circle is to conclude that the Attorney General did not really vitiate the notice he provided to law enforcement. Because law-enforcement officers received the TRO, they had "actual notice" of it.

## IV. HOLDING ANOTHER BRANCH OF GOVERNMENT IN CONTEMPT FOR OFFICIAL SPEECH RAISES SERIOUS CONSTITUTIONAL CONCERNS AND SHOULD BE RESERVED FOR ONLY THE CLEAREST VIOLATIONS

This is not an ordinary contempt case. Instead, it involves a federal district court holding a State attorney general in contempt for his official-capacity, out-of-court communication with other law-enforcement officials and the public. The communication was not required or prohibited by court order. Instead, it was an update sent at his discretion to keep enjoined non-parties apprised of the positions he was asserting in court and to clarify that he was not the source of non-enforcement of State law (as media had wrongly conveyed in the days before the letter). For the reasons already discussed, under the normal contempt standard, the letter was not contumacious. But even if it were a close call, this case would demand special solicitude given both the actor and the act at issue—and the serious separation-of-powers issues they raise.

First, the Court should not "ignore" the actor, because "a contempt sanction imposed on the Attorney General in his official capacity has greater public importance, with separation of power overtones, and warrants more sensitive judicial scrutiny than such a sanction imposed on an ordinary litigant." *In re Attorney Gen. of U.S.*, 596 F.2d 58, 64 (2d Cir. 1979). An attorney general, after all, is "a public official who exercises powers entrusted to him by both the executive and legislative branches, with obligations to the judicial branch.… Courts accordingly owe him respect as an official and, absent an abuse of power or misuse of office, the most careful and reasoned treatment as party or as litigant." *Id.* at 65; *cf. In re U.S.*, 985 F.2d 510, 512 (11th Cir. 1993) ("Requiring the FDA Commissioner to fight the subpoena by placing himself in contempt implicates separation of powers concerns and would harm the public perception of the FDA."). Thus, it should be the "rar[e]" case where an attorney general is held in contempt. *J.G.G. v. Trump*, 147 F.4th 1044, 1073 (D.C. Cir. 2025) (Rao, J., concurring).

Second, that the act here was speech warrants even greater sensitivity. *See Wood v. Georgia*, 370 U.S. 375, 389 (1962) ("Men are entitled to speak as they please on matters vital to them; errors in

judgment or unsubstantiated opinions may be exposed, of course, but not through punishment for contempt for the expression."); *Pennekamp v. Florida*, 328 U.S. 331, 346 (1946) (contempt for speech requires weighing of First Amendment values); *Speech First, Inc. v. Sands*, 144 S. Ct. 675, 676 (2024) (Thomas, J., dissenting) ("'[T]he threat of invoking legal sanctions and other means of coercion, persuasion, and intimidation' may cause self-censorship in violation of the First Amendment just as acutely as a direct bar on speech." (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963))).  And that it was official speech of another branch of government warrants greater sensitivity still.  As the Supreme Court has recognized, concomitant with the President's constitutional duty to "execut[e] the laws" is the "power [to] us[e] the office's 'bully pulpit' to persuade Americans, including by speaking forcefully or critically, in ways that the President believes would advance the public interest." *Trump*, 603 U.S. at 629.  This is also true for other executive-branch officials in the federal and state governments, who are likewise charged with broad duties to execute and enforce the law and have a need and obligation to communicate with the citizenry about issues of public concern.  Thus, using the contempt power to regulate an attorney

53

general's communications raises particularly thorny constitutional issues and could easily morph into judicial encroachment on the province of the executive. To guard against that constitutional danger, such speech should constitute contempt only in the clearest and most exceptional of circumstances.

<u>Third</u>, layered on top of the horizontal separation-of-powers issues is a federalism concern. Though federal courts no doubt possess broad equitable power, "appropriate consideration must be given to principles of federalism in determining the availability and scope of equitable relief." *Rizzo v. Goode*, 423 U.S. 362, 379 (1976). Accordingly, "considerations of comity and federalism argue for the federal courts' avoiding whenever possible getting involved in delicate issues concerning the internal structure of state government." *United Beverage Co. v. Ind. Alcoholic Beverage Comm'n*, 760 F.2d 155, 160 (7th Cir. 1985). "As representative of the dominant partner in the necessary interplay between the two sovereigns, federal courts must be especially sensitive to this balance and assiduous in its preservation." *Duke v. Texas*, 477 F.2d 244, 252 (5th Cir. 1973); *see also Harris v. Samuels*, 440 F.2d 748, 752–53 (5th Cir. 1971).

54

In this case, all these concerns are in play. The actor is the chief legal officer of a State with a population of millions and tens of thousands of law-enforcement officers. The act in question is his speech in an official capacity, communicating clarifications and criticism related to a judicial ruling on a matter of great public importance to the State. Florida, after all, has declared a state of emergency relating to illegal immigration. Fla. Exec. Order Nos. 25-120, 23-03. These facts counseled in favor of a contempt inquiry especially sensitive to avoiding encroachment on the State Attorney General's powers and rights.

Yet the district court dismissed these concerns as "misplaced" and, incredibly, inverted them to say that because "his words have power," an attorney general should effectively be subjected to a lower bar for contempt. Order at 21–23. Rather than apply "the most sensitive judicial scrutiny" out of respect for the separation of powers and federalism, *J.G.G.*, 147 F.4th at 1064 (Rao, J., concurring) (simplified), the district court barreled to a contempt finding by eschewing the proper legal standards and constitutional concerns, ignoring the Attorney General's reasonable explanations and materially altering the official speech at issue to find a violation. This was error, and one of serious magnitude

55

given the significant implications for the relationship between the federal judiciary and other branches of government.  If this kind of contempt inquiry for official speech critical of courts is blessed by this Court and becomes de rigueur, every elected official in this Circuit will inevitably face the difficult choice to either self-censor public commentary regarding judicial decisions or risk being subject to contempt.  This Court should not permit that to occur.

## CONCLUSION

This Court should reverse the district court's civil contempt order.

Dated: November 5, 2025      Respectfully submitted,

*s/ Jesse Panuccio*
Jesse Panuccio
Evan Ezray
Jason Hilborn
Daniel Morales
**BOIES SCHILLER FLEXNER LLP**
401 East Las Olas Blvd., Ste 1200
Fort Lauderdale, FL 33301
(954) 356-0011
jpanuccio@bsfllp.com
eezray@bsfllp.com
jhilborn@bsfllp.com
dmorales@bsfllp.com

*Counsel for Appellant Attorney General, State of Florida*

## CERTIFICATE OF COMPLIANCE

I certify that under Federal Rule of Appellate Procedure 32(a)(7)(B), Appellant's Opening Brief is proportionally spaced, has a typeface of 14 points, and contains 11,668 words, excluding the portions excerpted by Federal Rule of Appellate Procedure 32(f), according to the word-count feature of Microsoft Word used to generate this brief.

Dated: November 5, 2025                                    *s/   Jesse Panuccio*
                                                          Jesse Panuccio

58

**CERTIFICATE OF SERVICE**

I hereby certify that on this 5th day of November 2025, I electronically filed the foregoing brief with the Clerk of Court using the Court's CM/ECF system, which will send a notice of docketing activity to all parties who are registered through CM/ECF.


Dated: November 5, 2025                    *s/ Jesse Panuccio*
                                            Jesse Panuccio